Good morning. May it please the court, Vijay Shankar with the Department of Justice. Your Honors, I'd like to reserve three minutes for rebuttal, please. The question in this case is whether an airport search that was indisputably legitimate at the outset and conducted within the scope of the applicable regulations and directives was unconstitutional merely because at some point during the search the TSA agent subjectively began to suspect that she had come across contraband. The answer to that question we would submit is no and it is dictated by a long line of Supreme Court cases establishing that a searcher's subjective mental state plays no part in Fourth Amendment reasonableness analysis. Now, Your Honors, much has been made of the inconsistencies in the TSA agent's testimony and the District Court's finding that she was not credible. But as we argued in our briefs, we would submit that all you need to decide this case in the government's favor are three undisputed facts. First, the TSA agent was required to leaf through the entire stack of photographs in Mr. McCarty's bag. Why didn't she? Well, as soon as she had a reasonable basis to believe that there was contraband, at that point she exercised her duty to call her superiors and there was no point at that point in continuing the search of those photographs because that bag, at least at that point, was not getting on the airplane. Is it clear from the record that she saw contraband? Whether as a legal matter this was child pornography You're not answering my question. It is clear from the record that she believed that she had seen contraband at that point. Well, wasn't it the government's burden to prove that there's some dispute as to which photographs she saw, right? Yes. And the record is undisputed that there were some photographs in that album that were not contraband. Is that correct? That's still in dispute because obviously we haven't reached that point in the legal matter yet. Well, assume then, for the purpose of my question, that there were some photographs that were contraband and some that were not. Whose burden was it to prove that what she saw was in fact contraband? We would submit that nobody had that burden yet. That's the legal question in this case that would take place at trial. The question under the TSA directives is whether she had a reasonable basis to believe that she had come across contraband in order to call her superiors. Objectively? Yes. Objectively reasonable basis? Yes. As an objective matter. And if you look at the record in the district court's own findings, 57 of the 58 photographs here depicted prepubescent children in various states of undress. Many of them involved completely nude children in physical contact with each other and in physical contact with adults. And I think at least we would submit that any reasonable observer of those photographs would reasonably believe that that was contraband, at least enough of a matter to call her superiors or law enforcement. Let's see if I understand the government's position. She's screening the suitcase. She has perfect right to do that. She's looking for explosives. She's conducting an administrative safety search. Correct. And it was the government's convention before the district court that what happened was photographs spilled out. She looked at the photographs that spilled out and saw what to her appeared to be contraband. Correct. Now, are you telling me that the government was under no obligation to at least establish in the record that the photographs that she saw were in fact contraband? Yes, Your Honor. No obligation whatsoever? No. An obligation to show that she objectively, reasonably believed that these items were contraband. She is not a law enforcement officer, and she can't make that ultimate determination. Let's assume that under cross-examination at the hearing, she was asked if she could identify the photographs that she saw that caused her to alert law enforcement. And her testimony was, I can't do that. Same argument? Well, under the record here, we know that she saw virtually all of these photographs because in our view, there is no breaking point between the photographs that she saw when they had spilled out versus the photographs that she saw when she leafed through the remainder of the photographs because she was entitled, indeed required, to leaf through the remainder of the photographs. So if we take all of the photographs that she saw and the district court found that any reasonable searcher would not have reasonably concluded that this could be contraband, then that would be a different case. But that's not what the district court found. Do you agree that you can start a search as a legitimate administrative search, but that it can change character? It can change character based on the objective facts, not based on the subjective intentions of the searcher. Well, not so much the intentions, but she's there primarily to look for explosives, to see if within the sleeves of paper there's explosives, correct? Yes. And whether you call it objective or subjective, at some point she said she's not really checking for that. She's reading the materials, right? Well, she was leafing through the photographs and was noticing their content. She read the contents of a letter. Well, she only read a few lines, Your Honor. She read the contents of a letter. What did that have to do with safety? Your Honor, I think that as this Court said in Selgin, if we cannot require searchers to suppress their sensory faculties. Their nosiness. Well, no, Your Honor. I think that any reasonable searcher looking through a sheaf of materials would notice a few lines in a letter, and the record only establishes that she saw a few lines. She repeatedly testified that she did not read even a majority of the contents. What did reading the contents of the letter, or even part of it, have to do with safety? Reading the contents of a letter had nothing to do with safety, and we don't dispute that. But to expect a searcher who's leafing through photographs and papers to not notice the contents of a few lines in newspaper articles and letters, I think is just to suspend reality. How to suspend reality? I mean, look, here's a whole notebook of things, and if I'm looking through here to see if there's an explosive, I'd even let you look through my notebook, and you wouldn't be looking at the content that's on my pages, would you? You might not, but is it objectively? But that's what she did. Is it objectively unreasonable? This is the question. Is it objectively unreasonable for a searcher in that situation to notice a few lines, the contents of a few lines in a letter? That's the question I have. Is that a fair characterization of what she did? Did she go in and read some of this, or did she just, in passing, see a few lines? I thought that this is where we kind of come into the difference to the district court's factual findings. I thought that his factual findings about her credibility and what she did, that that's really what makes or breaks the case. Well, we're not trying to undo the district court's credibility findings here because we don't think we need to. What the district court found not credible about the searcher, we think is absolutely immaterial to the validity of the search. And that's motive? Right, motive. What pictures she saw when, what order the pictures were in when they spilled out, all of that is irrelevant, respectfully, Your Honors. She was entitled and indeed required to leaf through the entire stack of photographs under the TSA regulations. Do you want to save the remaining time? Yes, I would. Thank you. Good morning. May it please the court, Bill Harrison on behalf of the defendant appellee, Mr. McCarty. Security or sanctity, where do we draw the line here? In the name of safety, should the government have unfettered access to your privacy? Both Mr. McCarty and the court answered that question in a negative. What we had here is we had an individual, a TSA officer, Andrade, who was pulling out a laptop, and she claims that as she pulled out the laptop that some photographs fell out at the same time. There were 57 photographs in that envelope that day, that of those 57, 11 were of new children. And the court found, based on review of those 11 photographs, that nearly a third, just nearly a third of that 11 photographs had no depiction of nudity whatsoever, was clearly innocuous, I'm sorry, had depiction of nudity, but clearly innocuous. They had beach photographs there of a couple of children, et cetera. Did the court use the phrase clearly innocuous? I don't believe the court used that phrase. I used that phrase because what the court found was that there was nothing wrong with those photographs, that anyone seeing those photographs would deem that there's nothing wrong with those photographs. And the problem here was that Andrade couldn't testify at trial, at the hearing on this matter, as to what she saw when these photographs fell out. But more importantly, she gave various versions of what she saw. And ultimately what she said was, and this is a quote, she did not believe anything was wrong when she first saw them. So what happened at that point is her daughter comes over Moniz and they go through all the items. They go through all the photographs. They go through all of the personal notes. They go through the newspaper articles. They go through everything. So, counsel, what's your response to opposing counsel's argument that it didn't matter how many photos she saw because she was required to go through each one of them in any event? Well, that would be fine and dandy if she'd gone through all the photographs and leafed through them all and looked for this, let's say, called paper explosives. She didn't do that. What she did is she, according to her own testimony and according to Moniz's testimony who came directly over after the laptop was pulled out of the bag, they began, they stopped their inspection for safety concerns and they were looking at whether there was anything problematic with reference to the photographs of the children, whether the children were in harm's way. How does this differ from the Selgin case? Well, Selgin was a border case in which the object of the actual search was actually criminal investigations. They, we've always looked at, the courts have always looked at a difference between a border search than an internal search that we have at the airport. Clearly, there's less rights at the border. You're protecting the border. And what the Selgin officers did in that case is they were looking for money that was being sent out of the country. They were looking for money laundering offenses and the like. And as they went through this Selgin's property, they did find money. There was, I think, a $100 bill and it was 50,000 in Philippine pesos or something like that they found. And they found letters. Well, the court said in that situation they could look through those letters. This is a clearly investigatory enforcement. This is not an administrative search for safety concerns. So there's very much a difference between Selgin and what happened in this case. The court spent two days of testimony going through what happened in this case. And I would submit that there were a number of additional searches beyond what Andrade and Moniz did that were problematic. Because what Andrade and Moniz did if they were to follow protocol at the airport, the TSA protocol, was when they found something that they believed was contraband, you stop the search at that point. You call your law enforcement officer. That person comes over, takes a look at the items as they stand at that point, and decides whether they should go beyond that and call their local authorities. And the local authorities come over and decide what they want to do. At some point, wasn't that what happened? No. What happened is everyone who got there did their own individual search based on what they were told. And it's our position that what should have happened there was that the items were kept in the exact state that they were in, have the police come over, and the police at that point in time, we would submit, based on the testimony that was offered at the suppression hearing, that the police at that point would have to get a warrant to go further. Because when Sorrell, the officer who finally came to take the items, came, the items were in the envelope already. He saw nothing. He was told that there may have been contraband in the envelope. He saw nothing. He then took two to three minutes to pull out the items, look at them, and read them. Now, isn't there a difference here, though? Because they have the right to go through all the photographs, and even if they see potential contraband, it doesn't vitiate the explosive concern to go through and see if the other, what else is in there. So how do you square that? TSA does have a right to leaf through the items, and they have a right to look for this, what they call the paper explosives. But we would submit, like Your Honor had mentioned earlier about your book, you leaf through the items. You don't particularly look at the items. You don't particularly read the personal notes. You don't take a look at the paper clippings, the magazine clippings, the transcripts. You don't do that. You're looking for explosives. You're looking for danger. And, in fact, the TSA officer decided there was no danger. She stopped her investigation. One of the things is that district court did seem to infuse a little bit of motive in here, and yet under Wren and other cases, that's not something that we're supposed to look at. Does that undermine the district court's determination? No, because Your Honor had mentioned earlier that when does it become, from an administrative search to a personal search or a search beyond that, a criminal search, was there a line? When did that happen? And what Wren says is at the programmatic level that we can't look at the motive of the individuals as they do the search. We would submit that that changes when an individual who's not tasked to do a criminal investigation becomes an individual who's undergoing a criminal investigation. And then, yes, we look at the motive. Not the motive in terms of why did you begin the search itself, but the motive at that point in time as to why are you continuing the search in that vein, not the administrative search vein. One case says that, that you look at the motive if the administrative search exceeds the purpose of the administrative search. Well, I think that Torbett and Alki say that in an indirect manner. Those cases say that an airport screening search is reasonable if it is no more extensive or intensive than necessary in light of the current technology to detect weapons or explosives, and it's confined in good faith to that purpose. Now, good faith language, we believe, looks at the intent of the person when they're doing the search. So are you asserting that the TSA officer was acting in bad faith? We certainly are asserting that the TSA officer was acting in bad faith because she had mentioned during the course of her testimony that she was not initially bothered at some point. I do not believe anything was wrong when she first saw the photographs. In that case, then, what do you do at that point? Do you continue your administrative search, put the envelope in the luggage, and then let the luggage go forth, or do you, out of curiosity, look at the actual documents, start to read the documents, look at the magazine clippings, the transcripts, and go through all the other pictures and have your daughter, who's another TSA officer, come over and you both chat about what you're finding in the items. But the fact that you're mistaken about the parameters of your search doesn't necessarily imply bad faith. Did you make that argument to the district court? I believe we did make the argument. Did the district court make a finding as to whether or not this is bad faith? No, and, in fact, I believe the government gave up that argument in their brief. They mentioned that as well. The hearing, they referenced that, and I thought there was no appeal on that. That's correct. They weren't arguing that that had happened. I wasn't arguing that. What had happened? No, no, they didn't argue the good faith exception to this situation. But clearly it's our position that under the circumstances, and that's really the key here, under the circumstances of an administrative search, your obligation is for safety, safety alone. Your obligation does not go beyond that unless something objectively falls in your lap, it's contraband. And that was the key to this case. If Andrade had taken the stand and said the photograph spilled out and it was clear pornography and I called my LAO, in fact, one of the individuals who was the LAO, Kitamura, testified at the hearing that he didn't remember what photographs he first saw. Now, if you had seen child pornography, you would remember that child pornography. He testified that, yeah, I was given the photographs and I leafed through them. Well, what did you see? What drew your attention to the photographs? I don't remember which photograph I saw. So clearly no one remembers what photograph they saw, but they remember seeing all these new photographs at some point. So if all of the photographs had been child pornography, would it matter which one they saw? If all of them were child pornography, then we'd have a different situation here because It wouldn't matter which one they saw if all of them were child pornography. It wouldn't matter which one they saw, except at that juncture we would argue that they had to stop their proceedings if they really wanted to have the – well, actually, what they should have done is gone through all the items anyway to make sure that there was no leaf explosives and then called law enforcement at that point and not go through these stages of everyone taking a look and violating Mr. McCarty's privacy all along the line. We had four or five people go through these items before the police were called. And then the police then went through the items themselves. Does it matter at all? Is it relevant to this whole inquiry that the first person she called over, another TSA agent, happened to be her daughter? It doesn't really matter if it was her daughter or some other TSA agent. The clear import of that agent coming over was they both began at that point to continue the search. And the search, as Moniz said at that point, focused in on the children, the same thing that Andrade said. It was no longer safety concerns. Wouldn't it be fair to characterize what she was doing was asking for help from her fellow TSA agents as to what she was seeing? We would argue no. This is not something that you see every day. Yes, we would argue no because, first of all, Moniz came over at her own volition. She wasn't called over. She came over when the item was taken out, the dense item was taken out of the bag. At that point, she testifies. She comes over. She sees the item. She comes over. She has a different statement as to what happened at that point. But they began to review and go through the photographs, is what she says, and read the items. Thank you. Thank you. Your Honors, my colleague with due respect I think mischaracterized the search that took place here. And I think it's very important to remember that the record clearly reflects that the entire search involving Ms. Andrade took place in about one minute. So this notion that she was reading these materials at length and looking through the photographs and calling over her daughter and figuring out where these children were and whether they were in harm's way, I think it's just not consistent with the record. So we have a search that took place in about one minute, including what everyone conceded was a required search, a leafing through of the photographs. She was required to do that under TSA regulations. So whether she had in her mind come to the conclusion that this was child pornography before she leafed through those photographs or during or after is completely irrelevant. Under TSA regulations and within the scope of the administrative search, her conduct was the same. This court held in Bauhey that as long as the conduct would be the same regardless of the searcher's subjective state, then the search is valid. And that's exactly what we have here. Bauhey also involved an administrative inventory search. The officer halfway through the inventory search thought, hey, I might be coming across contraband here. That was virtually the exact situation we have here. And this court said that the search was valid. Judge McKeon, you said that the district court infused a little bit of motive analysis here. And I would respectfully argue that that's entirely what the district court did. It was much more than infusing a little bit of motive. He based his decision entirely on the searcher's subjective state, and he divided the search into a legal prong and an illegal prong based entirely on that. Thank you. Thank you, Your Honor. I thank both counsel for argument. Very interesting case. A case of United States v. McCarty is submitted.
judges: Hawkins, McKeown, Rawlinson